**SO ORDERED.**

**SIGNED July 24, 2026.**



_____
**JOHN W. KOLWE**
**UNITED STATES BANKRUPTCY JUDGE**

---

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAKE CHARLES DIVISION**

IN RE:
**APEX DISASTER SPECIALISTS**     **CASE NO. 24-20176**
**LOUISIANA, LLC**

                                       **Chapter 7**

    *Debtor*

---

**BACIK GROUP, LLC**

    *Plaintiff*                  **ADVERSARY PROCEEDING**
                                     **NO. 24-2009**

**VERSUS**

**APEX DISASTER SPECIALISTS**
**LOUISIANA, LLC, et al.**

    *Defendants*

---

### MEMORANDUM OPINION

This is an action by Bacik Group, LLC ("Bacik" or "Plaintiff") seeking to pierce the veil of the Debtor, Apex Disaster Specialists Louisiana, LLC ("Apex" or "Debtor"),

to hold the alleged owners of the Debtor, Jennifer Rulon ("Ms. Rulon") and her husband, Ray Wright ("Mr. Wright"), liable for the Debtor's debt to Bacik. Following a trial on the merits, the Court ordered the parties to file post-trial briefs and then took this matter under advisement following the submission of those briefs. The only issue for decision is whether the individual defendants may be held personally liable for Apex's debt to Bacik. The Court has considered the trial record, and for the reasons set out below, the Court will grant judgment in favor of Bacik.[1]

## JURISDICTIONAL STATEMENT

Bankruptcy jurisdiction "is grounded in, and limited by, statute." *Celotex Corp. v. Edwards,* 514 U.S. 300, 307, 115 S. Ct. 1493, 1498, 131 L. Ed. 2d 403 (1995); *see also in re Wilborn,* 609 F.3d 748 (5th Cir. 2010). Federal district courts "have original jurisdiction but not exclusive jurisdiction of all civil proceedings *arising under* title 11, or *arising in* or *related to* cases under title 11." 28 U.S.C. § 1334(b) (emphasis added). There are thus three types of bankruptcy jurisdiction: "arising under," "arising in," and "related to" jurisdiction.

"Arising under" jurisdiction encompasses claims created by title 11, such as an avoidance claim under 11 U.S.C. § 548. *See, e.g., Carlton v. BAWW, Inc.,* 751 F.2d 781, 787 (5th Cir. 1985). "Arising in" jurisdiction pertains to matters that could only arise in a case under Title 11. *Wilborn,* 609 F.3d at 752. "Related to" jurisdiction exists when "the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy." *Matter of Wood,* 825 F.2d 90, 93 (5th Cir. 1987) (quoting *Pacor, Inc. v. Higgins,* 743 F.2d 984, 994 (3rd Cir. 1984)). The district court is authorized under 28 U.S.C. § 157(a) to refer "any and all proceedings arising

---

[1] The Court entered an oral ruling on July 22, 2026, and now submits this Memorandum Opinion in support of its Judgment. The Court notes that this Memorandum Opinion contains certain corrections to its oral ruling that are explained below. These corrections have no effect on the Judgment. To the extent of any differences between the oral ruling and this Memorandum Opinion, the Memorandum Opinion governs.

under title 11 or arising in or related to a case under title 11" to the bankruptcy judges within the district.

"Arising under," "arising in," and "related to" bankruptcy jurisdiction is further classified into "core" and "noncore" jurisdiction under the statutory framework established by 28 U.S.C. § 1334 and 28 U.S.C. § 157. Proceedings that arise under or arise in title 11 are defined as "core" matters, and those that are only related to a title 11 case are defined as noncore matters. *See Stern v. Marshall,* 564 U.S. 462, 474-75, 131 S. Ct. 2594, 2603-04, 180 L. Ed. 2d 475 (2011). Core proceedings include but are not limited to 16 matters listed in 28 U.S.C. § 157(b)(2). Bankruptcy courts may statutorily enter final judgments in "core" proceedings, while in "noncore" matters bankruptcy courts may only submit proposed findings of fact and conclusions of law to the district court for review and issuance of a final judgment. 28 U.S.C. § 157(c)(1).[2]

Whether a claim brought under an alter ego or piercing the veil theory is a "core" matter is unsettled. *See in re Sys. Eng'g & Energy Mgmt. Assocs., Inc.*, 252 B.R. 635, 649 and n.17 (Bankr. E.D. Va. 2000) (recognizing that "[c]ourts considering whether 'veil-piercing' or 'alter ego' claims are subject to the core jurisdiction of the bankruptcy court are split on the issue" and collecting cases). However, the Fifth Circuit has held that a claim brought by a creditor against non-debtor owners of a debtor company under an alter-ego theory was within the bankruptcy court's core jurisdiction because it could impact the claims allowance or disallowance process. *See in re Charles Evans Trucking Inc.,* 595 B.R. 715, 722 (Bankr. S.D. Miss. 2018) ("Core proceedings include . . . allowance or disallowance of claims against the estate.") (*citing* 28 U.S.C. § 157(b)(2)(B)); *see also In re Moore*, 739 F.3d 724, 729 (5th Cir. 2014)); *but see, e.g., Phar-Mor, Inc. v. Coopers & Lybrand*, 22 F.3d 1228, 1236 and 1239 (3rd Cir. 1994) (holding that complaint filed by debtor corporation to pierce own veil was non-core and observing that "actions by a creditor to pierce the corporate

---

[2] Even if a bankruptcy court has statutory authority to hear a core matter, there may be constitutional limitations on a bankruptcy court's authority to enter a final judgment. *See Stern v. Marshall,* 564 U.S. 462, 131 S. Ct. 2594, 180 L. Ed. 2d 475 (2011). In those circumstances, the bankruptcy court may make a report and recommendation to the district court.

3

veil, or alter ego actions against the debtor corporation, are often considered non-core, 'related-to' proceedings").

While there is uncertainty among the courts as to whether a claim to pierce the corporate veil is a core proceeding, this Court will follow the Fifth Circuit's guidance in *In re Moore, supra*, and find that Bacik's action is a "core" proceeding because it pertains to and may affect the allowance or disallowance of claims filed in Apex's bankruptcy case. But, if upon review it is determined that this is not a core proceeding, then the Court finds that it has "related to" jurisdiction because Bacik's recovery from the owner of the Debtor could alter the Debtor's liabilities and influence the administration of the bankruptcy estate. *See in re Charles Evans Trucking Inc.*, 595 B.R. at 723. In that event, this Memorandum Opinion and corresponding judgment shall be considered the Court's report and recommendation.

## BACKGROUND

Following Hurricane Laura in 2020, Apex and Bacik executed a Master Subcontract Agreement ("Agreement") which provided that Bacik, as subcontractor, would engage in disaster remediation services for Apex's clients. Under the Agreement, Bacik was to be paid 70% of the total amount that Apex billed its clients. After Apex received payment from all the homeowners and insurance carriers for which Bacik provided services, Apex refused to pay Bacik. Thus, in 2021, Bacik filed suit in the United States District Court for the Western District of Louisiana for collection of the amounts due.

The District Court granted summary judgment in favor of Bacik and entered two judgments. The first was entered on February 1, 2023, in the amount of $200,700.75, representing the total amount owed to Bacik by Apex. The second was entered on May 9, 2023, in the amount of $60,210.23, representing Bacik's attorney fees and costs, which it was entitled to recover under Louisiana law. Apex did not appeal either judgment. The District Court explained its reasons for granting

4

judgment in *Bacik Grp. LLC v. Apex Disaster Specialists Louisiana LLC*, No. 2:21-CV-00447, 2023 WL 1460537 (W.D. La. Feb. 1, 2023).

Bacik made attempts to collect the judgments, including conducting a judgment debtor exam of Apex on December 12, 2023. Although Mr. Wright appeared at the exam on behalf of Apex, he did not bring any of the requested accounting and bank records of Apex. Thus, the exam was held open and continued to a later date.

Before the judgment debtor exam could be completed, Apex filed a Chapter 11, Subchapter V proceeding in this court on April 14, 2024.[3] That case did not progress smoothly, primarily due to the Debtor's failure to file accurate monthly operating reports, and other violations of basic bankruptcy rules. Thus, on November 6, 2024, the United States Trustee ("UST") filed a motion to convert Apex's case to Chapter 7.

At the hearing on this motion, the UST established that in the three months prior to Apex's bankruptcy filing, Ms. Rulon transferred large sums out of Apex's bank account to an account maintained and owned by her. It was also established that Ms. Rulon's pre-petition practice of indiscriminately transferring money out of Apex into accounts in her individual name had continued during the bankruptcy case. Additionally, the evidence showed that the Debtor had not adhered to any formal company accounting practices to distinguish between the company's finances and Ms. Rulon's personal finances. The Court also found that Ms. Rulon had generally flouted all bankruptcy and accounting rules resulting in material misstatements of the assets, income, and expenses of the bankruptcy estate. Thus, the Court granted the UST's motion and on February 6, 2025, entered an order converting Apex's bankruptcy case to Chapter 7.[4]

In the meantime, on June 13, 2024, Bacik initiated this adversary proceeding to pierce the corporate veil and pursue collection of Apex's debt to Bacik from the

---

[3] *In re Apex Disaster Specialists Louisiana, LLC*, Case No. 24-20176 (Bankr. W.D. La. 4/15/2024).

[4] *Id.*, Order Granting Mtn. to Convert Case Chapter 11 to 7 (ECF #150).

Debtor's alleged principals, Ms. Rulon and Mr. Wright. The trial of this matter was held on February 5-6, 2026, at which the Court heard testimony from Ms. Rulon, Mr. Wright, and Patrick Gros, a certified public accountant hired by Apex during the pendency of Apex's chapter 11 proceeding. The Court also admitted numerous bank statements and other documents into evidence.[5]

The Court will discuss the evidence admitted into the trial record below in context of the legal issues presented in this case. In short, the Court must determine whether the totality of the evidence supports piercing the veil of Apex to hold the owner of the company liable. The Court finds that it does and will therefore grant judgment in favor of Bacik.

## DISCUSSION

In Louisiana, an entity, such as a limited liability company, is a distinct juridical person and the "personality of a juridical person is distinct from that of its members." LA. CIV. CODE art. 24. Louisiana also recognizes that individual members of entities such as limited liability companies are generally shielded from personal liability for the debts incurred by such entities.[6]

This shield is vast, but it is not impenetrable. The statutes governing Louisiana limited liability companies, specifically La. R.S. § 12:1320, recognize that members and managers of those companies may be responsible for the debts and liabilities of a company in cases of "fraud," "breach of professional duty[,] or other

---

[5] The documentary evidence admitted into evidence during the trial is identified in Exhibits filed in Open Court (ECF #82), and it is limited to the following: the Plaintiff's admitted documents PL #1 – Bacik's Judgments against Apex; PL #2 – Apex Bank Statements, *in globo*, PL #3 – Apex Monthly Operating Reports, *in globo*, PL #4 through PL #13, which are secretary of state filings for numerous limited liability companies and other related contracts by those entities, which all have ties to Ms. Rulon and/or Mr. Wright, and PL #14 – Master Subcontract Agreement between Bacik and Apex. Defendants admitted a single document into the record, DEF JR #17, which is a multipage document entitled "Apex Disaster Specialists La, LLC Member Draws & Contributions Apr. 14, 2021 – April 14, 2024" and can be found in the Exhibit List (ECF #78).

[6] *Taylor v. South LA Contractors LLC*, No. 6:22-CV-00217, 2025 WL 51580 at *4 (W.D. La. Jan. 7, 2025), *aff'd sub. nom.*, *Taylor v. South LA Contractors LLC*, No. 25-30150, 2025 WL 2987443 (5th Cir. Oct. 23, 2025) (citing *Martin v. Spring Break 83 Prod., LLC*, 797 F. Supp. 2d 719, 724-25 (E.D. La. 2011), *aff'd sub nom. Martin v. Spring Break '83 Prods., L.L.C.*, 688 F.3d 247 (5th Cir. 2012)).

6

negligent or wrongful act."[7] Additionally, in exceptional circumstances, courts may apply a jurisprudentially created rule to hold members of limited liability companies responsible for the debts of the company by piercing the company's veil:

> [I]n narrowly defined circumstances, when individual members of a juridical entity such as an LLC mismanage the entity or otherwise thwart the public policies justifying treating the entity as a separate juridical person, the individual member(s) have been subjected to personal liability for obligations for which the LLC would otherwise be solely liable. When individual member(s) are held liable under such circumstances, it is said that the court is "piercing the corporate veil."

*Ogea v. Merritt*, 2013-1085 (La. 12/10/13), 130 So. 3d 888, 895 (*see, e.g.,* citing *Charming Charlie, Inc. v. Perkins Rowe Associates, L.L.C.*, 97 So. 3d 595, 598 (La. App. 1 Cir. 2012)).

The Defendants' primary defense to this action is purely legal. They contend that the company veil of Apex cannot be pierced under La. R.S. § 12:1320 and the Louisiana Supreme Court decision in *Ogea v. Merritt, supra*, because it is an LLC rather than a corporation. The Court has already rejected this argument in deciding other pre-trial motions. However, the defendants have again raised the same argument in trial briefing, and thus the Court will address it in this opinion.

According to the defendants, *Ogea* established that the exceptions in La. R.S. § 12:1320(D) are the sole and exclusive remedies for a creditor to hold the individual members of a limited liability company liable for the debts of the company. Thus, they contend that since veil piercing remedies are not listed as one of the exclusive remedies, those remedies cannot be asserted as a basis for recovery by Bacik. Put another way, the defendants assert that the definitions in § 12:1320(D) and holding of *Ogea* preclude the application of non-statutory, expansive jurisprudential theories of veil piercing in the limited liability company context. Thus, Defendants seek dismissal of Bacik's action on this legal basis.

---

[7] *See* LA. REV. STAT. § 12:1320(D).

7

This Court faced this exact argument in *Redguard, L.L.C. v. Areno (In re Areno)*, 615 B.R. 449 (Bankr. W.D. La. 2020).[8] In *Areno*, the Court was faced with making an *Erie* guess as to whether Louisiana courts would continue to apply jurisprudentially created veil piercing doctrines in cases involving members of limited liability companies post-*Ogea*. After performing a survey of Louisiana law on the matter, this Court set forth three reasons why a Louisiana court would continue to apply veil piercing doctrines to limited liability companies. First, the Louisiana Supreme Court in *Ogea* did not abrogate those doctrines in the limited liability context. Rather, it stated: "Piercing the corporate veil is largely a jurisprudential doctrine. . . Further it is a doctrine that has neither been relied upon by the lower courts in the instant case, nor invoked by the plaintiff." *Ogea*, 130 So. 3d at 894-95. Thus, the *Ogea* court did not address this issue.

Second, all five circuits of the Louisiana Courts of Appeal have historically applied veil piercing doctrines to limited liability companies, and they have continued to do so post-*Ogea*.[9] Third, Louisiana courts have relied upon treatises and other legal commentaries to conclude that "'the same policy considerations in piercing the veil of a corporation apply to an LLC.'" *In re Areno*, 615 B.R. at 460 (citing Louisiana cases that cited Susan Kalinka, Jaffrey W. Koonce and Philip T. Hackney, *Members and Membership Interests—Piercing the Veil of a Limited Liability Company*, 9 LA. CIV. L. TREATISE & PARTNERSHIP AND BUS. & TAX PLAN. § 1.32 (4th ed. Nov. 2019 update)). Thus, in *Areno*, it was this Court's *Erie* guess that veil piercing doctrines remain alive and well under Louisiana law in the limited liability company context.

---

[8] The defendants are aware of this court's *Areno* decision. However, they claim the court should revisit it because, in their view, *Areno* was not decided correctly.

[9] *See An Erny Girl LLC v. BCNO 4 LLC*, 257 So. 3d 212 (La. App. 4 Cir. 2018); *Hector v. Mo-Dad Envtl. Serv., LLC*, 134 So. 3d 133 (La. App. 3 Cir. 2014); *Charming Charlie, Inc. v. Perkins Rowe Associates, L.L.C.*, 97 So. 3d 595 (La. App. 1 Cir. 2012); *Bottom Line Equipment, L.L.C. v. BZ Equipment, L.L.C.*, 60 So. 3d 632 (La. App. 5 Cir. 2011); *ORX Resources, Inc. v. MBW Exploration, L.L.C.*, 32 So. 3d 931 (La. App. 4 Cir. 2010); *F.G. Bruschweiler (Antiques) Ltd. v. GBA Great British Antiques, L.L.C.*, 860 So. 3d 644 (La. App. 5 Cir. 2003*); Imperial Trading Co., Inc. v. Uter*, 837 So. 2d 663 (La. App. 2 Cir. 2002); *Hamilton v. AAI Ventures, L.L.C.*, 768 So. 2d 298 (La. App. 1 Cir. 2000).

Given the defendants' argument in this case, the Court updated its review of Louisiana law and finds that the federal district courts for the eastern, middle, and western districts of Louisiana, and Louisiana courts of appeal continue to apply veil piercing doctrines to members of limited liability companies.[10] Thus, this Court's *Erie* guess continues to be that, as a matter of law, veil piercing doctrines remain viable in the limited liability company context in Louisiana. Thus, the court will decide this case based on Louisiana's jurisprudential standards for determining whether a company's veil should be pierced.

Louisiana courts generally look to *Riggins v. Dixie Shoring Co.*, 590 So. 2d 1164 (La. 1991) for the factors that should be considered in determining whether a limited liability company's veil should be pierced.[11] In *Riggins*, the Louisiana Supreme Court held, in part:

> There are limited exceptions to the rule of non-liability of shareholders for the debts of a corporation, where the court may ignore the corporate fiction and hold the individual shareholders liable. Generally, that is done where the corporation is found to be simply the "alter ego" of the shareholder. It usually involves situations where fraud or deceit has been practiced by the shareholder acting through the corporation. . .
>
> Some of the factors courts consider when determining whether to apply the alter ego doctrine include, but are not limited to: 1) commingling of corporate and shareholder funds; 2) failure to follow statutory formalities for incorporating and transacting corporate affairs; 3)

---

[10] *See Hill Int'l, Inc. v. JTS Realty Corp.*, 2021-0157 (La. App. 1 Cir. 10/20/22), 370 So. 3d 16; *Mathes Brierre Architects v. Karlton/ISG Enters., LLC,* 2019-0357 (La. App. 4 Cir. 12/3/20), 311 So. 3d 532, *writ denied sub nom. Mathes Brierre Architects v. Karlton/ISG Enters., LLC, Int'l,* 2021-00029 (La. 3/16/21), 312 So. 3d 1090; *Patz v. Sureway Supermarket*, No. CV 17-3465, 2018 WL 6788088 (E.D. La. Dec. 26, 2018) (applying veil piercing factors to an LLC and finding the burden was not met); *Medve Energy Ventures LLC v. Warhorse Oil & Gas LLC*, No. 6:17-CV-01336, 2018 WL 7051038 (W.D. La. Nov. 21, 2018), *report and recommendation adopted*, No. 6:17-CV-01336, 2019 WL 303122 (W.D. La. Jan. 17, 2019); *Cargill, Inc. v. Clark*, No. CIV.A. 14-00233-BAJ, 2015 WL 4715010 (M.D. La. Aug. 7, 2015).

[11] *See Intelligent Mortg. & Consulting Servs., LLC v. Arbor Lending Grp., L.L.C.*, 2023-1183 (La. App. 1 Cir. 10/29/24), 405 So. 3d 899, *writ denied*, 2024-01446 (La. 2/19/25), 400 So. 3d 931; *Hill Int'l, Inc. v. JTS Realty Corp.*, 2021-0157 (La. App. 1 Cir. 10/20/22), 370 So. 3d 16; *Mathes Brierre Architects v. Karlton/ISG Enters., LLC,* 2019-0357 (La. App. 4 Cir. 12/3/20), 311 So. 3d 532, *writ denied sub nom. Mathes Brierre Architects v. Karlton/ISG Enters., LLC, Int'l,* 2021-00029 (La. 3/16/21), 312 So. 3d 1090; *Charming Charlie, supra.*

9

undercapitalization; 4) failure to provide separate bank accounts and bookkeeping records; and 5) failure to hold regular shareholder and director meetings. *Kingsman Enterprises v. Bakerfield Elec. Co.,* 339 So. 2d 1280 (La. App. 1st Cir. 1976); *Smith–Hearron v. Frazier, Inc.,* 352 So. 2d 263 (La. App. 2d Cir. 1977), *writ denied,* 353 So. 2d 1337 (La. 1978).

* * * * *

When a party seeks to pierce the corporate veil, the totality of the circumstances is determinative. *Harris v. Best of America, Inc.,* 466 So. 2d 1309 (La. App. 1st Cir. 1985); *Liberto v. Villard,* 386 So. 2d 930 (La. App. 3d Cir. 1980); *Smith–Hearron v. Frazier, Inc., supra.* In order properly to disregard the corporate entity, one of the primary components which justifies piercing the veil is often present: to prevent the use of the corporate form in the defrauding of creditors. *Liberto v. Villard, supra.*

*Riggins*, 590 So. 2d at 1168–69 (La. 1991). The *Riggins* factors are illustrative, not exclusive. *Id.* In the context of limited liability companies, the focus is primarily on the first, third and fourth *Riggins* factors, i.e., whether there is a commingling of company funds with those of the members, whether the company is undercapitalized, and whether the accounting records of the company and the members are independent of each other.[12] Ultimately, whether a company's veil should be pierced comes down to the totality of the circumstances.

The Court will now examine the trial record in light of the *Riggins* factors. The evidence consists of the testimony of Ms. Rulon, Mr. Wright, and Mr. Gros, as well as bank statements and other records identified in footnote 5 of this opinion. The evidence can generally be grouped into three categories for purposes of the Court's discussion: (a) Ms. Rulon's use of "holding accounts" she owned in her personal name, or the name of non-Apex entities, to receive transfers of cash from Apex; (b) vehicles

---

[12] Not all the *Riggins* factors apply in the context of limited liability companies. "Under Louisiana LLC law, members or managers of LLCs do not have to hold meetings, keep minutes or act through formal resolutions." *Cargill, Inc. v. Clark*, No. CIV.A. 14-00233-BAJ, 2015 WL 4715010 at *6 (M.D. La. Aug. 7, 2015) (quoting *ORX Res., Inc. v. MBW Exp., L.L.C.*, 32 So. 3d 931 (La. App. 4 Cir. 2010)).

10

owned by Ms. Rulon personally but paid for using Apex funds; and (c) the use of Apex funds to pay personal expenses of Ms. Rulon, Mr. Wright, and their family members.[13]

### a. The use of "holding accounts"

Ms. Rulon was questioned extensively regarding transfers that were made from Apex's bank account at Lakeside Bank into other accounts either in Ms. Rulon's name or in the name of now dormant companies owned by Ms. Rulon. Ms. Rulon referred to these accounts as personal "holding accounts." She explained that she routinely moved money out of Apex into the holding accounts "*to keep the balance in the Apex account low.*" She stated she would move money back to Apex's account if the company needed money.

Although the questioning primarily focused on two transfers — a $90,000 transfer from Apex to a dormant company owned by Ms. Rulon, JLC Enterprises, made in March 2023 just after Bacik obtained its judgment, and a $46,000 transfer made out of Apex into Ms. Rulon's personal bank account in April 2024, just before Apex filed bankruptcy — the bank statements and Ex. JR #17 show that such transfers were frequent. Indeed, the Court's review of these documents show that for the period from February 1, 2023, the date of Bacik's judgment against Apex, through April 14, 2024, the date of Apex's bankruptcy, approximately $450,000 was transferred out of Apex to the holding accounts (taking into account only transfers of $1,000 or more during this time period). For the same period, the transfers back into Apex from the holding accounts, including transfers from JLC Enterprises and Walking T Ranch, appear to be approximately $200,000 (again, considering only transfers of $1,000 or more).[14]

---

[13] Bacik also argued that the defendants have a habit of simply starting new companies to avoid paying creditors, and Bacik admitted numerous documents from the Louisiana Secretary of State showing entities owned by the Defendants over the years. However, there is no evidence showing that the defendants started these companies for the purpose of avoiding payment to creditors. Thus, the Court does not find this evidence compelling and rejects Bacik's argument.

[14] The Court placed its oral ruling on the record. The oral ruling stated that the transfers out of Apex exceeded $400,000, The figures used for the oral ruling were based on the bank accounts in the record (which cover January 2023 through November 2023 only) and pages 17 through 23 (of 23)

11

Despite this evidence, Ms. Rulon is adamant that she transferred more money into Apex than she transferred into the holding accounts, referencing transfers into Apex she claims to have made from her mother's succession and from Walking T Ranch, another company owned by her. As noted above, the bank statements and Ex. JR #17 show transfers into the Apex bank account from other accounts in the name of JLC Enterprises and Walking T Ranch. But the funds transferred in appear to be much less than those transferred out for the period from February 1, 2023, through April 14, 2024.

Moreover, had Ms. Rulon not transferred such large sums out of Apex into her personal accounts in the first place, it seems Apex would have had sufficient sums to pay Bacik's judgment. Ms. Rulon essentially admitted this fact. In briefing, Ms. Rulon stated that Apex always had sufficient money to pay Bacik, but that it had no intention of doing so: "**Apex did not pay the judgment because it was**

---

in Ex. JR #17. For the period from February 1, 2023, through November 30, 2023, the Court cross-referenced transfers out of Apex, in the amount of $1,000 or more as shown in the bank statements, to entries labeled "Transfer from Apex to Joint" on pages 17 through 23 (of 23) in Ex. JR #17. The Court also captured transfers shown from Apex into JLC Enterprises or Walking T Ranch, when labeled as such in the bank statement. For the period from December 2023 through April 14, 2024, the Court relied solely on the transfers shown on pages 22 and 23 (of 23) in Ex. JR #17, identified as "Transfer from Apex to Joint," as the record does not contain the bank statements for those months. The Court inadvertently omitted certain transfers from Apex to the joint account shown on page 23 (of 23) of the Exhibit. Taking those transfers into account shows that the total transfers out of Apex were approximately $450,000.

For purposes of the oral ruling, the Court indicated that the transfers into the Apex bank account from the holding accounts and from accounts in the name of Walking T Ranch and JLC Enterprises were less than $50,000. This figure was based on the transfers into the Apex account labeled as such in the bank statements in the record, which cover only the period from January 2023 through November 2023. The Court inadvertently omitted certain transfers into Apex from Walking T Ranch from July 2023, which are not labeled as such in the bank statements, but appear on page 4 (of 23) in Ex. JR #17. Additionally, the Court's oral ruling omitted transfers shown on page 5 (of 23) in Ex. JR #17 identified as "Transfer from Joint to Apex" for the periods from December 2023 through April 2024, and for which the Court does not have bank statements. Taking all those transfers into account shows that the total transfers into Apex from the holding accounts, JLC Enterprises, and Walking T Ranch were approximately $200,000.

These corrections do not change the Court's finding that the transfers out of Apex far exceed the transfers into Apex from the holding accounts and the accounts bearing the name of other, inactive entities. Nor does it change the Court's opinion that these transfers and all the transfers shown in the record support piercing the veil of Apex. Simply put, the finances of Apex, the defendants, and the other entities under the defendants' control are indistinguishable.

**incredulous and believed the circumstances lacked equity ... Apex possessed sufficient funds to pay Bacik for years** . . . Obstinance prevented payment."[15]

Ms. Rulon testified to the same effect at the trial, stating that the District Court's Judgment in favor of Bacik was unjust because, in her view, the District Court failed to give Apex credit for payments that were made to certain individuals that worked for Bacik.[16] But, Apex did not appeal the judgment. Instead, the evidence shows that Ms. Rulon took affirmative steps to ensure that Bacik would not be able to collect the judgment by transferring vast sums out of Apex.

Mr. Gros also testified. He is a certified public accountant and was accepted by the Court as an accounting expert. To be clear, he was not Apex's regular company accountant; he was hired by Apex approximately six months into Apex's Chapter 11 case, primarily to correct monthly operating reports and other filings with the court. He prepared Ex. JR. #17 during the pendency of the Chapter 11 bankruptcy.

Mr. Gros was asked about the transfers. He stated that owners of small businesses often make transfers between their personal accounts and business accounts as a form of cash management. He was then asked about the large transfers that occurred after Bacik obtained its judgment against Apex. Mr. Gros stated that Ms. Rulon informed him that the judgment was not final, due, and owing. Thus, he was under the impression that it did not need to be paid. Indeed, Mr. Gros appeared surprised when he found out for the first time, during his questioning at trial, that the judgment had become final a year before Apex filed bankruptcy. When presented

---

[15] Mem. in Opp. to Bacik Group, LLC's Motion for Summary Judgment (ECF #58) at 9 (emphasis added).

[16] Apex conceded that Bacik was entitled to summary judgment but disagreed that Bacik was entitled to the full amount it was claiming: "Apex asserts that Bacik is entitled to damages at the summary judgment stage but only for $125,352.26." *Bacik Grp. LLC v. Apex Disaster Specialists Louisiana LLC*, No. 2:21-CV-00447, 2023 WL 1460537, at *2 (W.D. La. Feb. 1, 2023). The District Court rejected Apex's argument, noting in a footnote that Apex never established how it reached this number ($125,352.26). *Id.* at n. 20. Regardless, this statement is in contrast with Apex's position during this trial, which is that the judgment was incredulous, meritless, and never owed.

with these facts, he conceded that the indiscriminate transfers to the personal holding account and accounts held in the name of dormant companies would be a "red flag" in his experience, as it could be evidence of fraud.

The Court agrees and finds that the numerous transfers between Apex, Ms. Rulon's personal accounts, and the accounts held in the name of other entities appear fraudulent as they appear calculated to hinder Bacik's ability to collect its judgments. Thus, in the Court's view, these transfers back and forth support piercing the veil of Apex to hold Ms. Rulon personally liable for Bacik's judgments. "[C]ourts frequently decline to protect a shareholder against personal liability where a single shareholder controls a number of different corporations and moves assets back and forth between the various corporations." *Hill Int'l, Inc. v. JTS Realty Corp.*, 2021-0157 (La. App. 1 Cir. 10/20/22), 370 So. 3d 16, 34 (*citing* Glenn G. Morris and Wendell H. Holmes, 8 LA. CIV. L. TREATISE, Business Organizations § 32:6 (2022)) ("Thus, in cases involving commingling of assets, poor financial record-keeping, or a complicated series of self-dealing transactions among a number of affiliated entities, piercing the veil serves functionally as a sort of "*res ipsa loquitur*" remedy for corporate creditors . . .").[17]

Moreover, the Court finds the *Riggins* factors are satisfied. The transfers resulted in a commingling of company and personal funds. Apex became grossly undercapitalized, and perhaps rendered insolvent at times, because of the transfers. And it clearly shows Apex was not employing basic accounting principles. Most significantly, these transfers satisfy one of the primary requirements under Louisiana law for piercing the veil: evidence of owners using the company form to defraud creditors. *See Riggins,* 590 So. 2d at 1169.

---

[17] Additionally, there is no evidence of these transfers being documented as loans. Nor were any explanations or justifications given for these transfers, other than to keep Apex's bank account balances low.

14

### b. "Company vehicles" owned personally by Ms. Rulon.

The Monthly Operating Reports in the trial record indicate that Ms. Rulon owned or leased, in her personal name, vehicles that were likely to have a value approaching $500,000. Even though these vehicles were owned by her, she did not personally pay for them. Undisputedly, the record shows that Ms. Rulon caused Apex to pay for all these vehicles. This is further evidence of undercapitalization, commingling of corporate and individual funds, and improper accounting practices. Most significantly, it shows that Ms. Rulon treated the business of Apex as her "individual business." *See Gordon v. Baton Rouge Stores Co., Inc.*, 168 La. 248, 121 So. 2d 759 (La. 1929) (president of corporation "treated the business of the corporation as his individual business by, *inter alia*, procuring leases in his own name that were intended for and actually used by the corporation.").

### c. Payment of personal expenses from the Apex operating account.

During the pendency of Apex's bankruptcy case, this Court found that virtually no corporate accounting formalities were being followed, and that the finances of the company and Ms. Rulon were impermissibly intertwined. Based on these factors (and other factors, such as the use of the holding account described above), the Court converted Apex's bankruptcy case from Chapter 11 to Chapter 7.[18]

The findings of this court in the bankruptcy case were not controverted during the trial of this case. At the trial, Ms. Rulon further testified that Apex funds were used to pay child support obligations for family members, addiction and recovery treatments, direct payments to the Louisiana Department of Child and Family Services for Ms. Rulon and Mr. Wright's involvement in a child custody dispute, personal legal fees, daycare expenses for her grandchildren, numerous entertainment purchases, insurance for non-employees, personal healthcare and health club bills for

---

[18] *In re Apex Disaster Specialists Louisiana, LLC*, Case No. 24-20176, (Bankr. W.D. La. 4/15/2024), Order Granting Mtn. to Convert Case Chapter 11 to 7 (ECF #150).

15

Ray Wright, monthly rent payments for a non-employee, a trip to Austin, Texas that was not related to Apex business, monthly payments on a Capital One credit card, and monthly payments on Venmo accounts that contained both personal and business charges. Additionally, company funds were paid to Old Navy, JCPenney, Bath & Body Works, the Children's Place, Connie's Men's Wear, Amazon Marketplace, Amazon Video, and Amazon Music.

While Ms. Rulon claims that some of these purchases were for business, she was unable to determine the extent that the payments were for business versus personal use. Nor did Ms. Rulon provide any accounting records that would allow the court to make such a determination. Simply put, it is impossible to quantify business expenses versus personal expenses. It is the Court's impression that Ms. Rulon ran a large sum of her personal household expenses through Apex. "An LLC is not a personal piggy bank." *In re KRSM Props., LLC*, 318 B.R. 712, 720 (B.A.P. 9th Cir. 2004); *see also in re Big Springs Realty LLC*, 426 B.R. 860 (Bankr. D. Mont. 2010) ("Blixseth used BSR as his personal piggy bank and stripped it of funds it needed to pay its obligations and now it appears that Blixseth is moving and transferring assets in an effort to protect such assets from potential judgments."); *In re Flutie New York Corp.*, 310 B.R. 31, 58 (Bankr. S.D.N.Y. 2004); *In re Gomez*, 560 B.R. 866, 868 (Bankr. S.D. Fla. 2016); *In re Rosenbaum*, No. 08-43029, 2010 WL 1856344 at *8 (Bankr. E.D. Tex. May 7, 2010), *aff'd*, No. 08-43029, 2011 WL 4553440 (E.D. Tex. Sept. 29, 2011); *In re Gbadebo*, 431 B.R. 222, 226 (Bankr. N.D. Cal. 2010).

In sum, the Court finds that the indiscriminate transfers and complete disregard for corporate accounting formalities demonstrate that Ms. Rulon treated Apex as a personal piggy bank. Moreover, these transactions, combined with the numerous transfers outlined above, show that the finances of Apex are indistinguishable from those of Ms. Rulon and her other entities. Based on the totality of all these factors, the Court will enter a judgment in favor of Bacik on its piercing the veil claim.

16

### d. Disposition of claims against Mr. Wright.

The Court will briefly address Bacik's claims against Mr. Wright. The record establishes Ms. Rulon as the sole member and owner of Apex. The record shows that Mr. Wright was the recipient or beneficiary of many of the transfers made by Ms. Rulon. Thus, Bacik seeks to hold Mr. Wright liable under the piercing the veil doctrine. However, since Mr. Wright is not a member, owner, manager, or officer of Apex, Bacik has not established grounds to hold Mr. Wright liable under a piercing the veil claim. Moreover, Bacik has not shown that Mr. Wright is liable to Bacik under La. R.S. § 12:1320(D). Therefore, the Court will grant judgment in favor of Mr. Wright, dismissing Bacik's claims against him.

### CONCLUSION

The Court recognizes that a company's veil should only be pierced in exceptional, narrowly defined circumstances. The totality of the circumstances here, as evidenced in the trial record, shows that those circumstances exist. The prolific transfers back and forth between Apex accounts and other non-Apex accounts, especially after Bacik obtained its judgment against Apex, support piercing the veil. The evidence that Ms. Rulon was using the company as her own personal piggy bank to pay vehicle loans and leases, and countless other personal expenses, further support the Court's conclusion. Accordingly, the Court will grant judgment in favor of Bacik and against Ms. Rulon on the piercing the veil claim. The Court also grants judgment in favor of Mr. Wright on Bacik's piercing the veil claim.

Bacik shall submit an order to the Court in conformity with this ruling within 10 days.